Morris Wexler and Annabel Wexler, Husband and Wife v. Commissioner.
Wexler v. Commissioner
Docket No. 49769.
United States Tax Court
T.C. Memo 1955-122; 1955 Tax Ct. Memo LEXIS 219; 14 T.C.M. (CCH) 447; T.C.M. (RIA) 55122; May 16, 1955
*219 1. In 1949, petitioner placed bets of several hundred thousand dollars with a bookmaker for himself and for one Luke Smith. The bookmaker's daily betting sheets showed all such bets as being made by petitioner and indicated net winnings of $58,105. Winnings in petitioner's name included winnings of $10,635 on lay-off bets which the bookmaker had placed through him. On some days during the year, Smith made bets directly with the bookmaker and, except in unusual circumstances, would not place bets through petitioner on those days. Winnings from bets placed in petitioner's name on such days were $43,815. The bookmaker settled bettors' credit accounts by cash payments or by switching accounts between bettors. Held, petitioner received $40,150 of additional gambling income in 1949 which was fully taxable to him in that year. 2. In 1950, an experienced accountant kept petitioner's books. Petitioner owned and operated a racing stable and bought and sold horses. He did not keep records on the purchase price of horses but gave such information personally to the accountant from memory. A part of the uncontested deficiency for 1950 resulted from the respondent's disallowance of the alleged *220 cost of a horse in computing the gain realized on its sale. Held, respondent correctly imposed a penalty under section 293(a) of the Internal Revenue Code of 1939 for petitioner's negligence in not keeping accurate records of the cost of horses purchased. Edward Ginsberg, Esq., Hippodrome Building, Cleveland, Ohio, for the petitioners. James F. Kennedy, Jr., Esq., and John K. Lynch, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This proceeding involves the following deficiencies in income tax and penalties determined by the respondent: Sec. 293(a)
Sec. 294(d)
Year
Deficiency
Penalty
Penalty
1949
$42,715.52
$2,206.26
$1,436.23
1950
10,760.66
538.03
2,150.00
$53,476.18
$2,744.29
$3,586.23
The issues to be decided are: (1) whether petitioner, *221 Morris Wexler, received gambling income in 1949 which he failed to report; and (2) whether the respondent correctly determined a penalty under section 293(a) for the year 1950. Petitioner no longer protests the imposition of penalties under sections 293(a) and 294(d) for the year 1949, if we uphold the respondent's determination of a deficiency for that year, based on the receipt of unreported gambling income. By amended petition, petitioner alleged that the respondent was barred from asserting a deficiency and penalties for the year 1949 because section 3631 of the Internal Revenue Code of 1939 had been violated. He did not, however, discuss that issue on brief and we, therefore, deem it to have been abandoned. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Morris Wexler (hereinafter referred to as petitioner) and his wife, Annabel Wexler, were residents of Cleveland, Ohio, and filed their joint returns for the years in issue with the collector of internal revenue for the eighteenth district of Ohio. Petitioner owned and operated a race wire service for the benefit of bookmakers and a racing *222 stable during the years in question. In 1949, petitioner placed bets of several hundred thousand dollars with a bookmaker by the name of William J. Griffiths (hereinafter referred to as Griffiths) of Barberton, Ohio. A part of the bets placed by petitioner were his own and a part were bets which he placed with Griffiths for one Luke Smith (hereinafter referred to as Smith), a so-called betting commissioner of Rochester, New York. When a bet was placed with Griffiths, it was recorded on a daily betting sheet. Such sheets showed the name of the person making the bet, the name of the horse, the amount of the bet, and the amount, if any, won. Griffiths also indicated on such sheets similar information with respect to so-called lay-off bets; i.e., bets which he had received and did not wish to keep and which he passed on to others. During 1949, Griffiths placed a number of lay-off bets through petitioner. Griffiths' betting sheets show net winnings of $10,635 on such lay-off bets which he carried in petitioner's name. The next day, after the bets were placed and the results of the races known, Griffiths recorded on cards the net winnings and losses of the various persons who had made *223 bets with him. It was not until then that the total bets which petitioner had made the previous day were separated between bets which he had made personally and those which he had made for Smith. Bets on more than three horses in the same race, and on two horses in the same race - one of which was owned by petitioner - are shown in his name on Griffiths' betting sheets for certain days during the year. Griffiths settled his accounts with various bettors by cash payments, or by certified checks made out to fictitious payees, or by so-called switches; e.g., if Griffiths owed Smith and Smith owed petitioner and petitioner owed Griffiths, Griffiths would switch the credit balance of Smith's account to petitioner's account. When a bettor's account was settled, his card was destroyed and a new card made up for him for subsequent bets or "action" with Griffiths. During 1949, Smith placed bets with Griffiths directly and also through petitioner. Smith used petitioner as a conduit for dealing with Griffiths because of difficulties which he and Griffiths sometimes experienced in dealing directly. For the year 1949, Griffiths' daily betting sheets showed total wins for petitioner of $386,945, *224 total losses of $328,840, and net wins of $58,105. Such sheets show that Smith in that year had total wins of $110,115, total losses of $84,025, and net wins of $26,090. Griffiths' betting sheets on the days when both petitioner and Smith placed bets showed total wins for petitioner of $237,155, total losses of $193,340, and net wins of $43,815. Petitioner maintained no records of either his personal betting activity or his betting activity in behalf of others. At the time of respondent's investigation, Griffiths had destroyed the card files on individual bettors for 1949, but the respondent determined that net wins of $58,105 reflected on Griffiths' daily betting sheets were petitioner's net winnings for the year, which constituted additional taxable income to him. He also determined that petitioner won a $150 baseball bet in 1951. Among the adjustments in petitioner's income tax for 1950, respondent disallowed the alleged cost of a horse which petitioner sold in that year in computing the gain on such sale. Petitioner's books were kept by an experienced accountant during the year but the information as to the cost of horses which petitioner purchased was given by him to the *225 accountant from memory. No vouchers or bills of sale for the horses, which petitioner purchased, were given to or seen by the accountant. Petitioner realized additional gambling income in the year 1949 of not less than $40,150. The deficiency in petitioner's tax for 1950 was due to negligence. Opinion RICE, Judge: Petitioner's principal argument against the respondent's determination that he received gambling income in 1949 is that he received no such income and that the respondent's determination is arbitrary because the records on which that determination was based are not conclusive evidence showing that he did, in fact, receive any gambling income. He thus attempts to shift the burden of proof to the respondent, by arguing that the respondent must show that he did, in fact, receive additional income from gambling and the exact amount thereof. The record does not support the petitioner's position. Insofar as records are concerned, it was petitioner who was negligent in not maintaining records of his betting activity. Griffiths' daily betting sheets, which were the basis of respondent's determination, are, in fact, the most basic evidence of petitioner's betting activity. *226 Admittedly, those sheets are not conclusive proof that the amounts indicated thereon were, in fact, the actual amount of petitioner's winnings for the year. Griffiths' file cards of individual bettors had been destroyed and it was those cards which apparently would have shown the breakdown between the bets which were petitioner's and those which had been made by him for Smith. The absence of those cards, however, does not vitiate the respondent's determination nor shift to him the burden of showing the exact amount of petitioner's winnings. Petitioner admitted that he made personal bets with Griffiths and we think on this record that it is wholly unreasonable to assume, as he would have us do, that his losses always equaled or exceeded his winnings. Smith testified that only in unusual circumstances would he have placed bets through petitioner on those days when he was placing them directly with Griffiths. Smith admitted, however, that even when he was placing bets with Griffiths directly, he also placed bets through petitioner when he was unable to reach Griffiths on the phone. That he placed bets personally with Griffiths and also with Griffiths through petitioner seems very probable *227 in the months of June and July 1949, when there was extensive betting activity on both his and petitioner's part. Smith, it is to be remembered, was a betting commissioner and it was to his advantage to place as many bets as possible. Petitioner's net winnings on the days when both he and Smith were placing bets were $43,815. Petitioner admitted, also, that on days when Smith placed no bets with Griffiths that he, himself, in addition to making bets for Smith, was making personal bets. It is, of course, possible that, as the respondent determined, petitioner realized net winnings from his own personal bets on many of those days. Petitioner testified that he never received any money from Griffiths in 1949, and that he, therefore, could not have received any gambling income in that year. Griffiths, on the other hand, admitted sending $15,000 to petitioner in either 1948 or 1949, but could not remember specifically in which year. The evidence is inadequate and, such as there is, too conflicting to make a finding as to the manner in which petitioner's net winnings with Griffiths were settled. The respondent devoted a considerable portion of his argument on brief to a discussion of the *228 doctrine of constructive receipt. From the evidence before us, we think there is no question but that petitioner's winnings, even though not received by him in cash, constituted taxable income to him in 1949. Regulations 111, Section 29.42-2. [1]
*229 As further proof that all of the bets recorded in his name on Griffiths' betting sheets were not his, petitioner argues that on certain days those sheets show bets in his name on three or more horses in the same race or on two or more horses, one of which he owned. He argues that no one would bet against himself or bet more than three horses in one race. Smith's testimony, to some extent, corroborated petitioner's argument, as did Griffiths'. Both Smith and Griffiths were experienced gamblers on horse races. Smith testified in answer to the question: "Now, would it be logical, if you know, for a man to bet five or six horses in the same race on his own account?" "Well, he would have to get his head examined. I would say that fellow, there is something wrong with that fellow. There is nobody can bet five or six horses on a race and figure to wind up with a winner, that is, for a sure thing." We think the respondent's argument is unrealistic in assuming that winnings, on those days when petitioner placed bets on many horses or on horses running in the same race with one owned by him, were exclusively from his personal bets. Insofar as the $10,635 which respondent determined that *230 petitioner won from layoff bets placed through him by Griffiths, there is testimony in the record that petitioner was not a bookmaker and thus did not take such bets himself. Griffiths testified that when he called petitioner to ask him to accept a lay-off bet, he would always wait for a return call from petitioner definitely confirming that the bet had been accepted. This, petitioner argues, is conclusive proof that he was passing Griffiths' lay-off bets on to some third party. We are satisfied that the evidence with respect to such layoff bets establishes that petitioner was not a bookmaker and that such bets were placed by Griffiths through him as a conduit and were, in turn, accepted by some third party. Our difficulty, however, in reaching a precise determination of petitioner's actual winnings is no one's fault but his own. Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930). His testimony at the hearing was vague and unconvincing. He admitted that he was not available for questioning by a Congressional committee investigating organized crime until a warrant for his arrest had been issued, whereupon he voluntarily appeared at a hearing of the committee in Washington, *231 D.C. At such hearing he declined to answer most questions asked him on the grounds of self-incrimination for fear of prosecution of his operation of a wire service and income tax violations. As we have said before, one whose income is derived from operations or activities on what might be called the "fringe of society" should make a far greater effort than other taxpayers to keep every record and every scrap of evidence of his financial transactions to substantiate the correctness of his return to the satisfaction of the Federal tax administrators. The petitioner here did not do that and we are satisfied that the record before us fully justifies our finding that petitioner received not less than $40,000 of additional gambling income from bets placed for himself with Griffiths. Petitioner's only evidence that he did not win a $150 baseball bet in 1949 was his testimony that he seldom made baseball bets and could not remember having won such sum. This is obviously insufficient to overturn the respondent's determination. We do not understand that petitioner disputes the respondent's determination of penalties under sections 293(a) and 294(d) if a deficiency is found for 1949. Petitioner *232 conceded his liability for the deficiency which the respondent determined for 1950 and for the penalty determined under section 294(d) for that year. He protests the imposition of the negligence penalty for 1950, however, on the ground that he employed an experienced accountant to keep his books and relied exclusively on him to keep those books accurately and to collect the information from which his returns were prepared. Petitioner's accountant was called as a witness and, for the most part, his testimony substantiates petitioner's argument. However, information with respect to the cost of horses which petitioner purchased was given to the accountant by petitioner who had no vouchers or bills of sale. The disallowance of the cost of one of the horses which petitioner sold in 1950 was a part of the respondent's adjustment in determining the deficiencies for that year. We think petitioner was negligent in not keeping accurate records on the purchase price of horses which he bought, since he operated a racing stable as a regular business. The respondent's determination of the penalty is, therefore, upheld. Decision will be entered under Rule 50. Footnotes
1. REGULATIONS 111. Sec. 29.42-2. Income Not Reduced to Possession. - Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.↩